UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


TAQUILLA HENDRIX

      Plaintiff                      Civil Action No. 10-14462

v.                                 HON. DENISE PAGE HOOD
                                    U.S. District Judge
                                    HON. R. STEVEN WHALEN

COMMISSIONER OF SOCIAL         U.S. Magistrate Judge
SECURITY,

      Defendant.
_____/


## REPORT AND RECOMMENDATION

      Plaintiff Taquilla Hendrix brings this action pursuant to 42 U.S.C. §405(g),
challenging a final decision of Defendant Commissioner denying her application for
Disability Insurance Benefits under the Social Security Act.  Both parties have filed summary
judgment motions which have been referred for a Report and Recommendation pursuant to
28 U.S.C. § 636(b)(1)(B).  For the reasons set forth below, I recommend that Defendant's
motion for summary judgment [Doc. #14] be GRANTED and Plaintiff's motion [Doc. #10]
DENIED.


## PROCEDURAL HISTORY

      On April 24, 2007, Plaintiff applied for Disability Insurance Benefits ("DIB"),
alleging disability as of August 1, 2002 (Tr. 107).  After the initial denial of the claim,
Plaintiff filed a timely request for an administrative hearing, held on June 30, 2009 in Flint,

Michigan before Administrative Law Judge ("ALJ") Peter M. Dowd (Tr. 28). Plaintiff, represented by attorney David M. Stewart, testified, as did Vocational Expert ("VE") Timothy L. Shaner (Tr. 33-59, 60-65). On August 18, 2009, ALJ Dowd found that Plaintiff was not disabled (Tr. 27). On October 25, 2010, the Appeals Council denied review (Tr. 1-5). Plaintiff filed for judicial review of the final decision on November 9, 2010.

## **BACKGROUND FACTS**

Plaintiff, born March 1, 1979, was 30 when the ALJ issued his decision (Tr. 27, 107). She completed high school and two years of college and worked previously as a nurse's assistant (Tr. 126, 131). Her application for benefits alleges disability as a result of nerve damage to the arms and legs and problems lifting (Tr. 125).

### A.    **Plaintiff's Testimony**

Plaintiff testified that she received an Associate's degree from Baker College in general health care, adding that she also held a Certified Nursing Assistant ("CNA") license (Tr. 34). She stated that currently, her living and medical expenses were paid for by her mother (Tr. 35). Plaintiff reported that prior to receiving the CNA license, she worked as an inspector of engine parts and as a program aide for a foster care program (Tr. 36).

Plaintiff reported that she had begun a college program to become an operating room assistant, but that hand and foot swelling forced her to leave school, adding that Baker College allowed her to receive the Associate's degree in general health care (Tr. 37). She acknowledged that she worked for two months in 2008 in a retirement home, requiring her to pass out medications and lift patients if required (Tr. 38). She stated that she left the job

due to headaches and hypertension, but admitted that she, as well as the rest of the staff, was laid off in 2008 due to a management change (Tr. 38).

Plaintiff reported that she stood 5' 7" and weighed 226 pounds, attributing a recent 36-pound weight gain to diabetes and medication (Tr. 39). She testified that she also experienced headaches and had undergone carpal tunnel surgery on her right (non-dominant) hand in September, 2006 (Tr. 39). She acknowledged that following surgery, she was cleared to return to work (Tr. 40). She alleged peripheral neuropathy of the arms, legs, and feet due to diabetes, noting that she had been diagnosed with diabetes during a November, 2008 hospitalization (Tr. 40). She remarked that the hospitalization was precipitated by a high heart rate and a high white blood cell count (Tr. 40). She stated that her high heart rate was attributable to stress as a result of unemployment and financial problems (Tr. 40).

Plaintiff testified that the primary cause of her disability was headaches, arm, hand, and finger pain, and leg pain, swelling, and numbness (Tr. 41). She rated her leg pain as a "7" on a scale of 1 to 10, but stated that her arms did not hurt (Tr. 42). She reported that she presently received treatment from a neurologist, a cardiologist, an internist, a dermatologist, a gastrologist, and a pain specialist (Tr. 42). She reported that at present, she experienced a "pseudo tumor, diabetes, peripheral neuropathy, and carpal tunnel syndrome ("CTS") (Tr. 43). She stated that her treating sources told her to stay off her feet, change her diet, and withdraw from college classes (Tr. 43). She denied taking medication for diabetes (Tr. 44).

Plaintiff denied alcohol or illicit drug abuse (Tr. 44). She stated that she was independent in self-care activities but performed housework only intermittently and with the

help of relatives (Tr. 45-46). She admitted that she continued to use a computer, shop for groceries, drive, and dine out (Tr. 46). She denied hobbies, but acknowledged that she had attended college classes until three months before the hearing and had traveled to Texas in the past year to visit a cousin (Tr. 47). She denied problems interacting with friends, neighbors, or her family (Tr. 48). She stated that she was able to read a newspaper but indicated that when her brain fluid levels were high, she experienced vision problems (Tr. 49). Plaintiff opined that her inability to kneel prevented her from returning to her inspection work and difficulty standing precluded her past work for the foster care program or work as a CNA (Tr. 50-51).

In response to questioning by her attorney, Plaintiff stated that her 2008 two-month work stint involved working 12-hours a day, three days a week (Tr. 52). She stated that she experienced headaches three days a week and required Vicodin and occasionally, Demorol for relief (Tr. 52). She alleged that on days she experienced headaches, she spent her waking hours reclining (Tr. 53). She stated that her withdrawal from classes in March, 2009 was attributable to her health problems (Tr. 53). She alleged that foot swelling and tingling obliged her to keep her feet elevated above chest level at least five hours a day (Tr. 54). She stated that her anxiety attacks were characterized by heavy breathing and sweating and lasted about five minutes (Tr. 55). She reported that brain fluid problems required her to submit to a spinal tap every three months (Tr. 55). She alleged that knee problems created difficulty climbing stairs, kneeling, squatting, crawling, and standing (Tr. 56). She stated that she was unable to stand for more than five minutes or walk for more than one block (Tr. 56). She

-4-

stated that sitting for long periods caused leg pain (Tr. 56). She alleged frequent dizzy spells, sleep disturbances, and drowsiness due to Cymbalta usage (Tr. 57). She described her vision problems as "a white cloud" over her eyes, stating that periodic lumbar punctures restored her vision (Tr. 58).

### B.    Medical Evidence

### 1. Treating Sources

An ophthalmologist's notes from September, 2002 state that a CT scan showed pressure on one side of Plaintiff's brain (Tr. 203). Neurologist D.V. Pasupuleti, M.D. noted that Plaintiff reported headaches but was fully oriented with "normal mentation and cognition, language function and speech" (Tr. 289). The following month, Plaintiff reported headaches, but did not show signs of optic disc swelling (Tr. 201). In November, 2002, Plaintiff reported blurred vision (Tr. 199). In January, 2003 ophthalmologist David K. Kiskin, M.D. noted that Plaintiff's vision was 20/20 with "slight enlargement of the left blind spot" (Tr. 234). He found no optic disc swelling (Tr. 234). The following month, Plaintiff reported "slightly" blurred vision (Tr. 193). In June, 2003, an EMG of the upper extremities showed peripheral poly neuropathy (Tr. 296).

In January, 2005, Dr. Pasupuleti stated that Plaintiff was doing "remarkably well except that once in a while she will get a headache," noting that she had been taking Topamax and Sinequan (Tr. 300). March, 2005 treating notes also state that she was "feeling well" (Tr. 347). However, in July, 2005, Plaintiff reported the onset of headaches after discontinuing Topamax (Tr. 301). She was prescribed Cymbalta (Tr. 301). The same month,

ophthalmology notes indicate that Plaintiff reported headaches (Tr. 187).  In September, 2005, Dr. Pasupuleti prescribed wrist splints (Tr. 302).

In September, 2006, surgeon Dong Wha Ohm observed that Plaintiff's symptoms of median nerve compression were "completely relieved" after undergoing a right carpal tunnel release the previous week (Tr. 237).  In November, 2006, Plaintiff told Dr. Pasupuleti that the September, 2006 carpal tunnel release did not relieve her pain (Tr. 320).  In December, 2006, Plaintiff was diagnosed with irritable bowel syndrome (Tr. 272).

In January, 2007, Plaintiff reported to Dr. Pasupuleti that Xanax did not quell her anxiety attacks (Tr. 306).  The same month, seeking treatment for an aching left heel, Plaintiff indicated on a medical history form sheet that she had not received psychiatric care (Tr. 376).  Dr. Pasupuleti noted that Plaintiff reported stress as a result of work and her grandmother's death (Tr. 306, 319).  Psychological counseling intake notes from the same month show that Plaintiff denied eye problems but reported headaches, nerve damage, and anxiety (Tr. 396). The following month,  Plaintiff stated that she was determined to deal with anxiety and self esteem issues by the end of April, 2007 (Tr. 400).  She deemed her own health "good" but not excellent (Tr. 411).  She stated that in the past, she had been traumatized by the murder of her fiancé (Tr. 413).  Her appearance, attitude, mood, and affect were deemed normal (Tr. 415).  She was assigned a GAF of 55[1] (Tr. 418).  The same month,

---

[1]A GAF score of 51-60 indicates moderate symptoms (occasional panic attacks) or moderate difficulty in social, occupational, or school functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders--Text Revision* at 34 (*DSM-IV-TR* ), 30 (4th ed.2000).

Josetta Tharippeal, M.D. noted that Plaintiff reported that Xanax helped her sleep soundly (Tr. 443).

In March and April, 2007, Plaintiff complained of "burning pain in her feet" (Tr. 271, 318, 390). Over the course of March and April, she missed work three times because of foot problems (Tr. 380-382). She was diagnosed with a fungal infection (Tr. 271). Podiatry notes state that Plaintiff had difficulty standing and walking for prolonged periods due to a heel spur (Tr. 391). In April, 2007, an EMG of the lower extremities ordered by Dr. Pasupuleti showed mild to moderate tarsal tunnel syndrome with peripheral poly neuropathy (Tr. 311, 316, 386, 444, 447). She presented with a "mildly puffy" fifth right toe (Tr. 392). In June, 2007, Dr. Pasupuleti noted that Plaintiff complained of pain upon "standing and lift[ing] patients (Tr. 445, 585). Plaintiff reported that "[h]er headaches come and go, but the bad ones are only now and then" (Tr. 585). July, 2007 counseling notes state that Plaintiff's weakness was "self esteem issues" and her strength was "self determination" (Tr. 368). Plaintiff was noted to have experienced a "mild reduction" of psychological symptoms (Tr. 398).

In August, 2007 Jolanta Sobotka, M.D. examined Plaintiff for foot pain (Tr. 421). Dr. Sobotka recommended physical therapy (Tr. 422, 481). He opined that Plaintiff "should have a sit down job, minding flat feet" (Tr. 422, 481). He noted the absence of ankle swelling (Tr. 42, 612). In October, 2007, Dr. Pasupuleti observed foot swelling, prescribing vasodilators (Tr. 586). Venous studies of the lower extremities were unremarkable (Tr. 610). In November, 2007, a psychological intake assessment assigned Plaintiff a GAF of 40 due

to depression and anxiety as a result of health limitations, family disputes, and anxiety[2] (Tr. 431-435, 488). Later the same month, she was assigned a GAF of 55 (Tr. 438). She was prescribed an antidepressant (Tr. 438).

In January, 2008, Dr. Pasupuleti advised Plaintiff to lose weight (Tr. 491, 587). In March, 2008, Dr. Pasupuleti noted that Plaintiff still smoked (Tr. 494). Plaintiff reported chest pains because of anxiety (Tr. 456). She admitted that she had not taken anything for anxiety for "a while" (Tr. 456). The following month, Plaintiff denied headaches, chest pain, or vision changes (Tr. 454). She requested an anti-anxiety drug for an upcoming flight (Tr. 454). The same month, Dr. Pasupuleti referred Plaintiff for cardiac studies after she reported an "intractable" migraine (Tr. 514, 588). In April, 2008, an EKG was "abnormal" but other cardiac studies were unremarkable (Tr. 498-500, 523-524, 526, 534, 550). She was diagnosed with hypertension (Tr. 497, 511). In May, 2008 imaging studies of the renal arteries were normal (Tr. 655). In July, 2008, Dr. Pasupuleti prescribed Treximet and administered a nerve block injection (Tr. 591-592, 648-649). The same month, an audiometric "workup" was normal (Tr. 650). The following month, Plaintiff requested medication to "calm her nerves down" on an upcoming flight (Tr. 617). In September, 2008, Dr. Pasupuleti administered a spinal tap (Tr. 595, 647, 729). In October, 2008, Plaintiff was treated for heart palpitations and chest pain (Tr. 520, 642, 712). She did not exhibit foot

---

[2]   A GAF score of 41-50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* at 34 (*DSM-IV-TR* )(4th ed.2000).

swelling (Tr. 645).  In November, 2008, a cardiac stress test was negative for abnormalities (Tr. 502).  Her diabetes was deemed under control (Tr. 509).  A Holter monitor recording showed no significant EKG changes (Tr. 555, 636).

The same month, Mark Luciano, M.D. of the Cleveland Clinic noted that a recent MRI of the brain was unremarkable (Tr. 601, 603-604, 626-627, 667).  A physical examination was essentially normal (Tr. 600-601, 666-667).  The same month, Plaintiff reported to her ophthalmologist that she had intermittently blurred vision as a result of a psuedo cerebri tumor (Tr. 569).  A foot exam was unremarkable (Tr. 634).  In January, 2009, Plaintiff reported a 50 percent improvement in headache symptoms after undergoing an epidural injection (Tr. 625, 628-630).  In February, 2009 Dr. Pasupuleti noted that Plaintiff continued to experience headaches, changing her medication from Lyrica to Cymbalta (Tr. 596, 623).  The following month, imaging studies of the brain were unremarkable (Tr. 598-599).  In April, 2009, Dr. Sankaran noted the absence of foot swelling (Tr. 615).

## 2.  Consultive and Non-Examining Sources

In June, 2007, Sidney Schuchter, M.D. performed a consultive examination of Plaintiff on behalf of the SSA (Tr. 327).  Plaintiff reported that she had been diagnosed with "hereditary peripheral neuropathy" in 1998 or 1999 (Tr. 327).  She alleged paresthesias and arm, leg, and foot pain and foot swelling (Tr. 327).  She reported daily migraine headaches and a diagnosis of pseudotumor cerebri in 2002 (Tr. 327).  She stated that spinal fluid was removed in 2002 but that she had not received treatment since (Tr. 327).  Dr. Schuchter noted that Plaintiff underwent carpal tunnel release in September, 2006 (Tr. 328).

-9-

Plaintiff exhibited 20/20 corrected vision (Tr. 328).  Dr. Schuchter observed no joint swelling or problems with coordination (Tr. 328).   Plaintiff exhibited normal manipulative abilities (Tr. 328-329).  Dr. Schuchter observed that her gait was normal and that she did not require a walking aid (Tr. 330).

The same month, a non-examining Residual Functional Capacity Assessment (physical) found that Plaintiff could lift 20 pounds occasionally and 10 frequently; sit, stand, or walk for six hours in an eight-hour workday; and push and pull without limitation (Tr. 334).  She was limited to occasional climbing of ladders, scaffolds, and ropes, and frequent (as opposed to *constant*) balancing, stooping, kneeling, crouching, crawling, and the climbing of ramps and stairs (Tr. 335).  The Assessment found the absence of manipulative, visual, or communicative limitations, but found that Plaintiff should avoid even moderate exposure to hazards such as machinery and heights (Tr. 336-337).  Plaintiff's claims were deemed only partially consistent with the medical record (Tr. 336).

### 3.  Material Submitted After the August 18, 2009 Administrative Decision

On January 29, 2010, Dr. Pasupuleti completed a medical source statement of Plaintiff's residual function capacity, finding that Plaintiff was unable to lift 10 pounds, walk or stand even two hours in an eight-hour workday, or sit for six (Tr. 758-759).  Plaintiff was precluded from all climbing, balancing, kneeling, crouching, crawling, or stooping (Tr. 759).   Dr. Pasupuleti found further that Plaintiff experienced limitations in reaching, handling, fingering, and feeling limiting her to only "occasional" manipulative functioning (Tr. 760).  Dr. Pasupuleti also found that Plaintiff was limited by "periodic blurred vision"

-10-

due to migraine headaches and pseudotumor cerebri (Tr. 760). He found that Plaintiff's

exposure to temperature extremes, noise, vibration, hazards, and fumes should be limited (Tr.

761).

### C.   Vocational Expert Testimony

VE Timothy Shaner classified Plaintiff's former work as an engine inspector as

unskilled and exertionally light; program aide, semiskilled/very heavy (as performed); and

nurse's aide as semiskilled/heavy (as performed)[3] (Tr. 62, 172).   The ALJ then posed the

following hypothetical question to the VE, taking into account Plaintiff's age, education, and

work history:

> [A]ssume . . . that the individual in a potential work setting could maximumly
> lift weights of ten pounds, repetitively lift weights of less than ten pounds.
> Could stand and walk intermittently during an eight-hour workday for two of
> eight hours. Could sit for six of eight hours in a normal eight-hour workday.
> And could only occasionally climb stairs, balance, stoop, kneel, crouch, and
> crawl. And would have needed to avoid even moderate exposure to hazards
> such as unprotected heights from moving industrial machinery. And that from
> a mental standpoint the individual is limited to simple, routine, and repetitive
> work activities in a stable work environment, indicative of the maximum mental
> capacity to do unskilled work. Could such an individual perform any of Ms.
> Hendrix's past work?

---

[3]20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds
at a time and occasionally lifting or carrying articles like docket files, ledgers, and small
tools;  *light* work as "lifting no more than 20 pounds at a time with frequent lifting or
carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50
pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and
that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with
frequent lifting or carrying of objects weighing up to 50 pounds. *Very Heavy* work requires
"lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of
objects weighing 50 pounds or more. § 404.1567(e).

(Tr. 63). The VE stated that the above limitations would preclude all of Plaintiff's past jobs, but would allow the sedentary work of a surveillance system monitor (550 positions in the regional economy); order clerk (550); hand packager (2,500); and assembler (non-manufacturing) (1,700) (Tr. 63). The VE stated that his job numbers reflected June, 2009 statistics but that as of 2007, the number would have been "at least" 10 percent higher (Tr. 64). In response to questioning by Plaintiff's attorney, the VE stated that manipulative limitations as a result of peripheral neuropathy would eliminate all but the surveillance monitor positions [4] (Tr. 64). He stated further that the vision problems alleged by Plaintiff would preclude all competitive employment (Tr. 65). The VE concluded by stating that his testimony was consistent with the information found in the Dictionary of Occupational Titles ("DOT") (Tr. 65).

**D. The ALJ's Decision**

Citing Plaintiff's medical records, the ALJ found that Plaintiff experienced the severe impairments of "(1) history of carpal tunnel syndrome with right wrist/hand carpal tunnel surgery on September 5, 2006; (2) obesity with relatively recent onset diabetes mellitus and complaints of paresthesias in the arms and feet; and (3) history of headaches," but that the conditions did not meet or medically equal an impairment found in Part 404 Appendix 1 Subpart P, Appendix No. 1 (Tr. 20, 22). The ALJ found that Plaintiff retained the Residual

---

[4]

Placed in the context of the VE's testimony, the transcript's text stating that manipulative limitations "[w]ould eliminate all of the surveillance system monitor" appears to be an error in transcription which ought to have read "[w]ould eliminate all *but* the surveillance system monitor" (Tr. 64).

Functional Capacity ("RFC") for sedentary work requiring "only occasional climbing of stairs, balancing, stooping, kneeling, crouching and crawling; and . . . avoid[ing] even moderate exposure to hazards such as unprotected heights or moving industrial machinery" (Tr. 23). Citing the VE's job numbers, the ALJ determined that Plaintiff could perform the work of a hand packager, assembler, surveillance systems monitor, and order clerk (Tr. 27).

The ALJ discounted Plaintiff's allegations that she was unable to perform even sedentary work, noting that treating and examining records did not support claims that she needed to keep her feet elevated for several hours or take long naps (Tr. 24). He cited examination notes stating that Plaintiff exhibited good "grip strength, coordination, and dexterity" (Tr. 24).

### STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir.

1986)(en banc).  In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy.  20 C.F.R. §416.920(a).  The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

-14-

## ANALYSIS

### A.  Substantial Evidence

Plaintiff argues, in effect, that ALJ Dowd's selective discussion of treating records supporting the non-disability finding amounted to a distortion of the record.  *Plaintiff's Brief* at 1-4.  For example, she points out that while the ALJ cited a surgeon's finding that carpal tunnel release had resolved all symptoms, the ALJ ignored her later statement that the procedure had not helped her.  *Id.* at 1 (citing Tr. 237, 272).

I disagree that the ALJ's citation of certain sources and the lack of mention of others amounted to "cherry picking" or a distortion of the medical findings.   The ALJ acknowledged that following the September, 2006 procedure, Plaintiff continued to complaint of hand and foot problems, accurately observing that "the etiology of [her] alleged pain is not altogether clear" (Tr. 20).  The ALJ observed that despite Plaintiff's claims, she exhibited full motor strength, reflexes, and full grip strength (Tr. 20, 328-329).

Plaintiff also asserts that the evidence supports her claim that she is unable to stand for more than five minutes and needs to elevate her legs throughout the day.  *Plaintiff's Brief* at 2.  She cites Dr. Pasupuleti's June, 2007 treating notes in support of this claim.  *Id.*  In fact, the June, 2007 treating notes state that Plaintiff experienced pain upon attempting the exertionally heavy work that she performed as a nurse's aide (Tr. 445).   The fact that Plaintiff is unable to continue performing exertionally heavy work is not in dispute.  Citing Dr. Sobotka's August, 2007 finding that Plaintiff required a "sit down job," the ALJ restricted her to sedentary work (Tr. 23, 422).  Plaintiff cites Dr. Pasupuleti's January, 2010

opinion that she is unable to perform even sedentary work (Tr. 758-761). However, as discussed in detail below, the January , 2010 assessment was performed well outside the relevant period and is thus immaterial to the present claim. 42 U.S.C. 405(g).

While Plaintiff argues further that the ALJ erroneously found that no medical records created after November, 2008 support her headache allegations, the ALJ's did *not* find that the treating records failed to show further reports of headaches (Tr. 25). Rather, he stated that "There are no medical records after November, 2008 which indicate  that [her] headaches result in . . . disability" (Tr. 25). Consistent with this finding, Plaintiff reported a 50 percent improvement headaches in January, 2009 after undergoing a epidural injection (Tr. 625). Although Plaintiff again complained of headaches in February, 2009, the April, 2009 treating notes do not indicate that Plaintiff continued to experience headaches; instead, they state only that she had been receiving Diamox for the condition (Tr. 615).

Plaintiff also argues that the ALJ impermissibly downplayed the effect of her headaches between 2003 and 2007. *Plaintiff's Brief* at 2 (citing Tr. 25). However, the ALJ's summation of this period is supported by the treating records showing that Plaintiff was doing "remarkably well except that once in a while she will get a headache" (January, 2005) and her statement that she was "feeling well" (Tr. 300, 347). While Plaintiff reported headaches in July, 2005 (Tr. 187), the ALJ's characterization of the period between 2003 and 2007 is not erroneous.

Likewise, Plaintiff's argument that her allegations of anxiety and depression were given "short shrift" is unavailing. *Plaintiff's Brief* at 3. The ALJ's finding that Plaintiff's

-16-

psychological symptoms were "mild" was well explained and well supported[5] (Tr. 21-23). He correctly noted that Plaintiff's psychological treatment had been "limited," citing treating source findings that anxiety did not affect her "concentration, memory, focus or cognition" (Tr. 21). Aside from the ALJ's findings, I note that the fact that Plaintiff received psychological treatment only for the first few months of 2007 and then for less than a month in November, 2007 would not meet the 12-month durational requirement establishing a work-related impairment[6] (Tr. 368, 400, 438).

Finally, Plaintiff's two-sentence argument that the ALJ erred by not including her alleged need to "miss a day or two" of work each week because of headaches and/or blurred vision in the hypothetical question is without merit. *Plaintiff's Brief* at 4. The ALJ thoroughly discussed his reasons that Plaintiff's headaches and intermittent "blurry vision" did not prevent the work indicated by the RFC, reasonably finding that these conditions did not prevent Plaintiff from driving, traveling independently by plane, shopping semimonthly,

---

[5]

Although Plaintiff notes that at one point, she received a GAF score of 40, the transcript shows that later the same month, she was assigned a score of 55 (Tr. 435, 438). Moreover, the ALJ was not required to adopt or even discuss the GAF scores. *Kornecky v. Commissioner of Social Security,* 167 Fed.Appx. 496, 511, 2006 WL 305648, *14 (6th Cir. 2006)("[W]e are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a GAF score in the first place."); *Howard v. Comm'r of Soc. Sec.,* 276 F.3d 235, 241 (6th Cir.2002). "[A] [GAF] score may have little or no bearing on the subject's social and occupational functioning." *Kornecky,* at *13. Further, a low GAF does not equate with occupational problems. For example, a GAF of 41-50 "reflects the assessor's opinion that the subject has serious symptoms *or* serious impairment of social or occupational functioning." *Id.* (emphasis in original).

[6]In fact, in March, 2008, Plaintiff stated that she had not taken "anything" for anxiety "in a while" (Tr. 456).

using a computer, attending college courses, working 36 hours a week, and earning a CNA certificate after the alleged onset of disability (Tr. 25). Having explained his reasons for discounting Plaintiff's professed level of limitation, he was not obliged to include the rejected claims in the hypothetical question. *Stanley v. Secretary of Health and Human Services,* 39 F.3d 115,118-119 (6th Cir.1994)(*citing Hardaway v. Secretary of Health & Human Servs.,* 823 F.2d 922, 927-28 (6th Cir.1987).

### B. Material Submitted After the August 18, 2009 Opinion[7]

Plaintiff relies heavily on Dr. Pasupuleti's January, 2010 assessment for the proposition that she is unable to perform even sedentary work. *Plaintiff's Brief* at 2, 5. However, because Dr. Pasupuleti's January, 2010 assessment was not submitted prior to the administrative opinion, this Court cannot consider this new evidence in deciding whether to "uphold, modify, or reverse the ALJ's decision." *Cotton v. Sullivan*, 2 F.3d 692, 695-696 (6th Cir.1993). Rather, where the Appeals Council denies a claimant's request for a review

---

[7]

Plaintiff's present brief , lifted verbatim from counsel's brief to the Appeals Council (Tr. 174-179), refers confusingly to "recently" re-filed medical records (Tr. 669-756?) that were not included on an earlier exhibit disc. *Plaintiff's Brief* at 3, (Tr. 177). Contradicting this statement, the "Appeals Council" exhibit lists only Dr. Pasupuleti's January, 2010 assessment and Plaintiff's Appeal's Council brief as the only post-administrative decision submissions (Tr. 5).

In any case, even assuming that (1) the ALJ did not review transcript pages 669-756 and (2) Defendant's mishandling of the material found at transcript pages 669-756 constitutes "good cause," these records do no provide grounds for a "Sentence Six" remand. Plaintiff does not explain how these records would change the ALJ's decision. My own review of these records shows that they refer to treatment documented elsewhere in the transcript (such as the September, 2008 spinal tap), or consist of routine lab results and medication prescription renewals and do not form a basis for changing the administrative decision.

based on latter submitted material, Sentence six of 42 U.S.C. § 405(g) states that the court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding ..." Hence, this Court may consider the additional evidence only for purposes of determining whether remand is appropriate under the sixth sentence of § 405(g). *Hollon ex rel. Hollon v. Comm'r of Soc. Sec.,* 447 F.3d 477, 483 (6th Cir.2006).

Because the January, 2010 assessment does not address Plaintiff's condition on or before the August 18, 2009 administrative decision, it is irrelevant to the present claim. *Sizemore v. Secretary of Health & Human Services,* 865 F.2d 709, 712 (6th Cir.1988). If Plaintiff believes that her condition has worsened since August 18, 2009, the "appropriate remedy" would be to "initiate a new claim for benefits." *Id.* While the fact that the January, 2010 assessment is intrinsically irrelevant to the claim moots the question of whether "good cause" exists for the late submission, I note that Plaintiff has not provided any reason that she was unable to procure a treating assessment prior to the ALJ's decision. The possibility that the assessment was created as a "rebuttal" to ALJ's August, 2009 findings does not constitute good cause. "[G]ood cause contemplates more than strategic delay, or sandbagging, of evidence and more than simple miscalculation of the necessity of producing such evidence in the first instance to establish a claim of disability." *Haney v. Astrue,* 2009 WL 700057, *6 (W.D.Ky.2009) (citing *Thomas v. Secretary,* 928 F.2d 255, 260 (8th Cir., 1991)).

In closing, I emphasize that my recommendation to uphold the Commissioner's

-19-

decision is not intended to trivialize Plaintiff's physical condition or personal tragedies. Nonetheless, the overriding question in this appeal is whether the ALJ's decision was supported by substantial evidence. In particular, record evidence that Plaintiff was able to work, shop, attend college, and travel past the alleged onset of disability date supports the administrative conclusion. Based on a review of this record as a whole, the ALJ's decision is within the "zone of choice" accorded to the fact-finder at the administrative hearing level, and as such, should not be disturbed by this Court. *Mullen v. Bowen*, *supra*.

## CONCLUSION

For the reasons stated above, I recommend Defendant's motion for summary judgment be [Doc. #14] GRANTED and Plaintiff's motion [Doc. #10] DENIED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

-20-

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.


s/ R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Date: March 3, 2012


CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail disclosed on the Notice of Electronic Filing on March 3, 2012.


s/Johnetta M. Curry-Williams
Case Manager